# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MARYLAND
*Southern Division*

|                          |   |                          |
|--------------------------|---|--------------------------|
| **2023 BR HOLDINGS, LLC,** | * |                          |
| Plaintiff,               | * |                          |
| v.                       | * | Case No.: **PWG-17-320** |
| **WARREN WILLIAMS,**     | * |                          |
| Defendant.               | * |                          |

\* \* \* \* \* \* \* \* \* \* \* \* \* \*

## MEMORANDUM OPINION

This is a loan collection dispute where Plaintiff 2023 BR Holdings, LLC ("2023 BR") seeks to collect payment from the guarantor, Defendant Warren Williams, after the original debtor has defaulted. Pending is 2023 BR's Motion for Summary Judgment.[1] ECF No. 17. I find that that no genuine dispute of material facts exist regarding Williams's liability, late fees, mailing costs, recording fees, advertising fees, and title search fees. But, I find genuine disputes of material facts exist as to the calculation of interest payments and the trustee's fee. Lastly, I find 2023 BR's motion for attorneys' fees to be premature. Accordingly, I will grant 2023 BR's motion in part and deny it in part and this case shall proceed to a bench trial regarding the remaining damages.

## Background

On October 28, 2014, 2023 Benning Road, LLC ("Benning Road") acting through Warren C. Williams, Jr., its Managing Member, entered into a loan agreement ("Note") with

---

[1] The parties fully briefed the motion. ECF Nos. 17-1, 23, 28. A hearing is not necessary. *See* Loc. R. 105.6.

City First Bank of D.C., N.A. ("City First Bank"). Note 1, ECF No. 1-1. The Note was for $1,961,250.00 and was to mature in one year. *Id.* On that same day, Williams entered into a guaranty agreement ("Guaranty") with City First Bank, under which he would be liable for the Note if Benning Road, the borrower, failed to pay. Guaranty 1, ECF No. 1-2. The Note matured on October 28, 2015 and neither Williams nor Benning Road paid the Note in full. Pl.'s Mem. ¶ 3; Def.'s Opp'n ¶ 1. On December 9, 2016, City First Bank assigned its rights in the Note to 2023 BR in exchange for $655,000. Assignment Docs. 1, ECF No. 1-5.

On February 2, 2017, 2023 BR filed suit against Williams, alleging breach of his Guaranty and seeking to collect the outstanding principal and other fees and costs it believed were due under the Note. Compl., ECF No. 1. 2023 BR has moved for summary judgment and seeks the award of damages on a breach of Williams's Guaranty. Pl.'s Mot.

### **Standard of Review**

Summary judgment is proper when the moving party demonstrates, through "particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials," that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a), (c)(1)(A); *see also Baldwin v. City of Greensboro*, 714 F.3d 828, 833 (4th Cir. 2013). If the party seeking summary judgment demonstrates that there is no evidence to support the nonmoving party's case, the burden shifts to the nonmoving party to identify evidence that shows that a genuine dispute exists as to material facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 585–87 & n.10 (1986). The existence of only a "scintilla of evidence" is not enough to defeat a motion for summary judgment. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986). Instead, the

evidentiary materials submitted must show facts from which the finder of fact reasonably could find for the party opposing summary judgment. *Id.* A "genuine" dispute of material fact is one where the conflicting evidence creates "fair doubt"; wholly speculative assertions do not create "fair doubt." *Cox v. Cty. of Prince William*, 249 F.3d 295, 299 (4th Cir. 2001); *see also Miskin v. Baxter Healthcare Corp.*, 107 F. Supp. 2d 669, 671 (D. Md. 1999). The substantive law governing the case determines what is material. *See Hooven–Lewis v. Caldera*, 249 F.3d 259, 265 (4th Cir. 2001). A fact that is not of consequence to the case, or is not relevant in light of the governing law, is not material. *Id.*; *see also* Fed. R. Evid. 401 (defining relevance).

## Discussion

"A guaranty agreement is a contract under which the guarantor promises to perform the obligations of the principal if the principal fails to perform." *CapitalSource Fin., LLC v. Delco Oil, Inc.*, 608 F. Supp. 2d 655, 662 (D. Md. 2009) (citing *Gen. Motors Acceptance Corp. v. Daniels*, 492 A.2d 1306 (Md. 1985)); *see also Ammerman v. Miller*, 488 F.2d 1285, 1293 (D.C. Cir. 1973); *Vaccaro v. Andersen*, 201 A.2d 26, 28 (D.C. 1964). Thus, the Note and Guaranty are both contracts. *See Ammerman*, 488 F.2d at 1293; *Vaccaro*, 201 A.2d at 28. Under the laws of the District of Columbia,[2] "[t]o prevail on a claim of breach of contract, a party must establish (1) a valid contract between the parties; (2) an obligation or duty arising out of the contract; (3) a breach of that duty; and (4) damages caused by breach." *Logan v. LaSalle Bank Nat'l Ass'n,* 80 A.3d 1014, 1023 (D.C. 2013) (quoting *Tsintolas Realty Co. v. Mendez,* 984 A.2d 181, 187 (D.C. 2009)). When deciding whether a party breached a contract, "the plain and unambiguous meaning of an instrument is controlling, and the Court determines the intention of the parties

---

[2] The Note provides that "[t]he validity and construction of this Note and all matters pertaining thereto are to be determined according to the laws of the District of Columbia." Note 3. The Guaranty also provides that it "shall be governed by and construed, interpreted, and enforced in accordance with and pursuant to the laws of the District of Columbia." Guaranty § 5.11.

3

from the language used by the parties to express their agreement." *Cunningham & Assocs., PLC v. ARAG, LLC*, 842 F. Supp. 2d 25, 28 (D.D.C. 2012); *A-J Marine, Inc. v. Corfu Contractors, Inc.*, 810 F. Supp. 2d 168, 185 (D.D.C. 2011)). Therefore, insofar as the terms of the Note and Guaranty are unambiguous, they are controlling. *See Cunningham*, 842 F. Supp. 2d at 28.

It is undisputed that Williams was a guarantor to and personally liable for the Note between Benning Road and City First Bank in the amount of $1,961,250.00, and neither the principal debtor nor Williams paid the loan in full when it came due on October 28, 2015. Pl.'s Mem. ¶¶ 2–3; Def.'s Opp'n ¶ 1. It also is undisputed that the outstanding principal is $1,163,696.07. *See* Pl.'s Mot. ¶ 4; Def.'s Opp'n ¶ 1. Therefore, I find based on these undisputed facts that Williams is liable as a guarantor for the Note original held by City First Bank and that the amount defaulted on is $1,163,696.07. *See Alger Corp. v. Wesley*, 355 A.2d 794, 797–98 (D.C. Cir. 1976) (finding the issuance of summary judgment as to liability on a note was proper when defendants failed to raise genuine issues as to liability) (citing *Berman v. Grp. Health Ass'n*, 316 A.2d 863 (D.C. 1974)).

Williams, however, disputes whether it is 2023 BR to whom he is liable, arguing that there is a genuine dispute of material fact regarding whether 2023 BR is the real party in interest, as well as the computation of damages. Def.'s Opp'n ¶¶ 2–6. 2023 BR argues that City First Bank assigned all rights, title, and interest in the Note to it. Pl.'s Reply ¶ 1. Therefore, 2023 BR argues that its subsequent assignment of its rights was merely a collateral assignment to secure a loan, whereby it still maintains all of its rights to collect on the Note. *Id.*

<u>Collateral Assignment</u>

As an initial matter, I must determine if a genuine issue of material fact exists in determining if 2023 BR is the proper holder of the Note and permitted to collect the money owed

4

on it.  Williams argues that 2023 BR completed an outright assignment of its rights under the Note to WashingtonFirst Bank, adding that

> it appears that plaintiff is not the holder of the Note, is not the real party in interest, and lacks standing to assert this claim.  There is nothing before the Court to show that plaintiff retained the authority to seek the collection of this Note, or that Washington First Bank delegated the authority to do so.

Def. Opp'n 1–2.  Williams does not cite any law in support of this proposition or explain where his understanding of the terms of the assignment come from, asserting (in conclusory terms) merely that it "appears to be an assignment."  *Id.* at 1.

The argument Williams raises is one of standing and in particular whether 2023 BR is the real party in interest as required by Rule 17(a).  The Rule requires that "an action must be prosecuted in the name of the real party in interest."  Fed. R. Civ. P. 17(a).  Here, if 2023 BR outright assigned its rights under the Note to WashingtonFirst Bank, it would no longer be the real party in interest, as the original holder loses all legal rights and entitlements, and the assignee becomes the real party in interest for collection purposes.  *See Brandenburger & Davis, Inc. v. Estate of Lewis*, 771 A.2d 984, 988 (D.C. 2001) (citing D.C. Code § 28-2102; *Nat'l Union Fire Ins. Co. v. Riggs Nat'l Bank*, 5 F.3d 554, 556 (D.C. 1993)); *Honey v. George Hyman Const. Co.*, 63 F.R.D. 443, 447 (D.D.C. 1974).  However, a partial assignment is different:

> [W]hen there has been only a partial assignment the assignor and the assignee each retain an interest in the claim and are both real parties in interest.  Thus, in an action involving an assignment for collection . . . or an assignment for security, the assignor retains a sufficient interest in the property to be a real party in interest, and under Rule 17(a) either party may sue to protect those rights.

6A Charles Alan Wright & Arthur R. Miller, Fed. Prac. & Proc. § 1545 (3d ed. 2017) ("Wright & Miller").

In this case, the wording of the allonge[3] to the Note ("Allonge") and the December 9, 2016 agreement between 2023 BR and WashingtonFirst Bank ("Security Agreement") is unambiguous. Assignment Docs. 6; Security Agr. 1–2, ECF No. 28-1. The Allonge states that "THE NOTE is hereby endorsed and *collaterally assigned* to WASHINGTONFIRST BANK pursuant to a Security Agreement . . . ." Assignment Docs. 6 (emphasis added). The Security Agreement states that WashingtonFirst Bank will loan $500,000 to 2023 BR and in doing so, 2023 BR "hereby grants to [WashingtonFirst Bank] a *security interest* in . . . [a]ll monies due and payable upon that certain indebtedness evidenced by that certain Deed of Trust . . . dated October 28, 2014, made by [Benning Road] . . . in the face amount of $1,961,250.00." Security Agr. 1 (emphasis added). The language of the documents, which specifically refers to the transaction as "collaterally assigned" and "a security interest," makes it clear that the Security Agreement is not an outright assignment of all rights held by 2023 BR, but rather an agreement to use the Note as security for a loan, whereby 2023 BR does not lose its interest in the Note unless it has defaulted and WashingtonFirst Bank forecloses. 2023 BR is therefore, the real party in interest. *See* Wright & Miller § 1545.

### Damages

As there is no dispute over the amount of principal owed in this case, Pl.'s Mot. ¶ 4; Def.'s Opp'n ¶ 1, Williams was, at the time 2023 BR filed its motion, liable for $1,163,696.07. However, as this property was foreclosed in bankruptcy and sold since 2023 BR filed its motion,

---

[3] An allonge is "a slip of paper sometimes attached to a negotiable instrument for the purpose of receiving further indorsements when the original paper is filled with indorsements." Allonge, *Black's Law Dictionary* (10th ed. 2014).

Status Report 1, ECF No. 29, he is only liable for the principal minus any proceeds 2023 BR received through the bankruptcy sale.

Williams also argues that there are material disputes of fact regarding some of the damages figures claimed by 2023 BR including the trustee's fee, late fees, interest, advertising costs, and "attorney's fees associated with the foreclosure." Def.'s Opp'n ¶¶ 3–4 (quoting Rubin Aff. 1, ECF No. 1-6). 2023 BR argues that the Note terms determine all of these fees and that its affidavits and supplemental materials are sufficient to prove there is no genuine dispute of material fact. Pl.'s Mot. 4–5; Pl.'s Reply 3–4. Specifically, 2023 BR has provided an affidavit whereby Andrew Rubin, 2023 BR's manager, attested the following damages were owed as of February 1, 2017:

1) "Principal, interest, late fees and legal fees" in the amount of $1,311,688.47, which would increase by $295.47 daily;

2) Foreclosure advertising fees in the amount of $3,480;

3) Recording fees in the amount of $75.52;

4) Mailing costs in the amount of $27.29;

5) Title search costs in the amount of $250.00;

6) "Attorneys' fees associated with the foreclosure" in the amount of $2,500.00; and

7) Trustee's fee in the amount of $32,416.36.

Rubin Aff. 1. In its Reply, 2023 BR supplemented this information by providing the interest accrual in spreadsheet form ("Interest Accrual Spreadsheet"), ECF No. 28-3, a receipt from the auctioneer for the advertising costs in the Washington Times, Other Expenses 13, ECF No. 28-4, and invoices from its counsel, ECF No. 28-5. The attorneys' fees were updated to $4,995.69, Pl.'s Reply ¶ 4(b); Attorneys' Fees Stmt. 1, ECF No. 28-5.

7

a. Interest Payment

2023 BR shows that it was entitled to interest, but it provides only one figure, which includes its interest calculation combined with the amount owed in remaining principal, late fees, and legal fees. Rubin Aff. 1. Williams argues that there is no way to evaluate the legitimacy of the interest claimed at this juncture because the affidavit is conclusory and 2023 BR has not specified when it began calculating interest and the rates it was applying. Def.'s Opp'n ¶¶ 4, 6. 2023 BR argues that the "default rate is applicable," and that Williams's argument that the default rate applies post judgment is inconsistent with the Note. Pl.'s Reply ¶ 4(a).

The Note is unambiguous in its terms in this regard also. In the event of a default, the lender may apply the "Default Rate" of interest:

> [T]he Lender may [upon default], in the Lender's sole discretion and without notice or demand, in addition to any other remedy the Lender may exercise, raise the rate of interest accruing on the unpaid principal balance of this Note by five (5) percentage points above the interest rate otherwise applicable hereunder ("the Default Rate") regardless of whether the holder elects to accelerate the unpaid principal balance as a result of such default.

Note 2. Because Williams and the debtor defaulted, 2023 BR is entitled to interest. *See id.* However, the question remains as to the amount Williams owes to 2023 BR.

It is clear by the unambiguous language of the Note that 2023 BR is entitled to a minimum of 9.25% interest annum. As stated, upon default and without notice, the lender is permitted to increase the interest rate by 5%, and the rate was never to be below 4.25%. *See id.* at 1–2. Additionally, Williams was made aware that the Note was to be subjected to the Default Rate by City First Bank. Def.'s Default Ltr. 1, ECF No. 1-4. However, 2023 BR's evidence is not sufficient for me to grant its Motion for Summary Judgment as to the interest it seeks.

First, the Rubin Affidavit does not set forth the amount of interest that had accrued as of February 1, 2017 when Rubin provided the Affidavit, solely that from then onward it would

accrue at a rate of $295.47 daily. Second, the Interest Accrual Spreadsheet appears to have inconsistencies with the Affidavit and the interest that could be awarded in this case. The Interest Accrual Spreadsheet, establishes that there were two interest rates to be applied: a rate of 9.50% before December 16, 2016 and a rate of 9.75% thereafter. Interest Accrual Spreadsheet 1. However, according to the date on that same spreadsheet, the interest charged did not change upon the rate increase. Additionally, it is unclear how 2023 BR calculated the daily interest as $295.47, given that the default letters sent on behalf of City First indicated that interest would accrue at a rate of $281.34 per day. ECF Nos. 1-3, 1-4. The lack of clarity over the amount of interest is further exacerbated by 2023 BR first filing the Interest Accrual Spreadsheet with its Reply, which did not afford Williams an opportunity to respond. Lastly, I find the record incomplete on this issue because, given that the property sold in foreclosure, Status Report 1, the remaining principal for which interest is charged against may have decreased, which would affect the amount of daily interest accrued. A trial is necessary to resolve these factual questions.

  b. *Trustee's fee*

2023 BR also claims that it should be awarded a trustee's fee in the amount of $32,416.36 pursuant to Section 10.3 of the Deed of Trust and Security Agreement ("Trustee Agreement").[4] Compl. ¶ 10; Rubin Aff. 1 (referring to the Trustee Agr., ECF No. 28-2). Two pages of that agreement are appended to 2023 BR's Reply. Trustee Agreement. 2023 BR argues that the document entitles it to a sum of 2.5% the total amount due as a trustee's fee. Pl.'s Reply ¶ 2. Williams argues that there are two issues with awarding a trustee's fee: (1) there does not appear

---

[4] This Trustee Agreement was signed on the same date as the Note and the Guaranty and although each share similar names all three documents are separate. The Security Agreement is a fourth separate agreement.

9

to be any provision for a trustee's fee, and (2) if it were proper to award a trustee's fee, it would be to a trustee, not 2023 BR. Def.'s Opp'n ¶ 3.

Benning Road, as the Grantor, and William L. Frazier, Jr. and Marjeau Bullock, as the trustees entered into the Trustee Agreement on October 28, 2014. Tr. Agr. Excerpt 1. Within the pages of the Trustee Agreement 2023 BR submitted in its Reply, the determinative section reads as follows:

> 10.3 Commission on Advertisement
>
> Immediately upon the first publication of an advertisement of any sale to be made under or by virtue of Article IX of this Deed of Trust, whether made under the power of sale therein granted or under or by virtue of judicial proceeding or of a judgment or decree of foreclosure and sale, Trustee shall be entitled to receive as compensation from the Grantor a commission equal to Two and One-Half Percent (2.5%) of the total amount then due on account of the Indebtedness and, upon the first publication of any such advertisement, such commission shall be considered earned by the Trustee, payable by the Grantor, and a part of the Indebtedness. The commissions provided for in Sections 10.2 and 10.3 shall not be cumulative.

*Id.* § 10.3.

2023 BR attaches evidence that advertising fees were paid in association with the foreclosure sale of the property. Other Expenses 13. Section 10.3 of the Trustee Agreement states that for the commission to go into effect, the sale must be "made under or by virtue of Article IX of this Deed of Trust"; however, 2023 BR did not include Article IX in the record. Therefore, on the incomplete record before me, I cannot determine as a matter of law if the Trustee took action pursuant to Article IX, and if so, whether the fee was due to 2023 BR, as opposed to being due to the trustees directly. Consequently, 2023 BR's motion regarding the trustee's fee will be denied and this issue set for trial. *See* Fed. R. Civ. P. 56(a), (c)(1)(A); Fed. R. Evid. 106; *Cunningham*, 842 F. Supp. 2d at 28; *A-J Marine*, 810 F. Supp. 2d at 185.

*c. Mailing Costs, Recording Fees, Advertising Fees, and Title Search Fees*

2023 BR argues that it is entitled to mailing costs ($27.29), title search fees ($250.00), advertising fees ($3,480) and recording fees ($75.52). Rubin Aff. 1; Pl.'s Mot. ¶ 6; Pl.'s Reply ¶ 4(b). Williams argues that these fees are conclusory and that there is nothing in the record by which he can evaluate the claim. Def.'s Opp'n ¶ 4. 2023 BR insists that it provided the figures to Williams as part of its initial disclosures. Pl.'s Reply ¶ 4(c). 2023 BR also filed receipts for the four categories of expenses. Other Expenses 1, 12–14, 17–18.

> The documents indicate that Williams is liable for certain costs and the Note states that
>> the Borrower agrees to pay attorney's fees, whether suit be brought or not, and all other costs and expenses reasonably connected with collection, the protection of the security, the defense of any counterclaim, the enforcement (including without limitation, as a part of any proceeding brought under the Bankruptcy Act of 1978, as amended) of any remedies herein provided for, or provided for in the Deed of Trust and the enforcement of any guaranty.

Note 2–3. The Guaranty provides that Williams guarantees to the Beneficiary "the payment of all of the costs and expenses of the Beneficiary . . . incurred in the enforcement of this Guaranty, Loan Agreement and other Security Documents." Guaranty ¶ 2.0(b)(vii).

There is uncontroverted evidence in the record that 2023 BR spent $3,480.00 on advertising fees and $250.00 on a title search. Rubin Aff. 1; Other Expenses 13–14. Williams only contends that these expenses are conclusory. 2023 BR has entered into evidence sufficient information to establish it is owed for the advertising fees and title search fee. Therefore, the burden has shifted to Williams. And, as Williams has not provided any evidence that contradicts the Rubin Affidavit and the receipts in evidence, I find that there is no genuine dispute of material fact as to the title search and advertising expenses and 2023 BR is entitled to recover these costs. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 585–87 & n.10.

The Rubin Affidavit includes mailing costs and recording fees, but the amounts stated exceed the receipts provided. *Compare* Rubin Aff. 1 *to* Other Expenses 1, 12, 17–18.[5] However, Williams does not present any evidence to the contrary. Thus, there is no dispute that 2023 BR is entitled to a minimum of $25.88 in mailing costs and $63.00 in recording fees, but I cannot determine as a matter of law that 2023 BR is entitled to more than that.

I further find that these expenses fall within the clear language of the Note, and that issue is not challenged by Williams. Therefore, Williams is liable for the expenses based on the language of the Guaranty. 2023 BR is awarded $3,818.88 for the full amount of the advertising fees and title search fees and the amount proven by receipts in mailing costs and recording fees. 2023 BR's motion for the remaining mailing costs and recording fees is denied without prejudice so that it may supplement the record at trial.

d. *Late fees*

2023 BR argues that it is entitled to late fees pursuant to the Note, but as stated, includes them in one figure that encompasses principal, interest, and legal fees as well. Pl.'s Mot. 6. Williams argues, as he has with the other compiled figures, that it too is conclusory and that he cannot evaluate the claims legitimacy. Def. Opp'n 4.

The Note indicates that late charges are owed for any installment that is more than ten days late and equivalent to 5% of what is owed. Note 2. Additionally, City First Bank sent two letters to Williams and Benning Road upon the default of the loan, and those letters notified Williams that there were late fees owed in the amount of $54,922.57. ECF Nos. 1-3, 1-4. And the Interest Accrual Spreadsheet includes a column entitled "Late Charges," in which the same amount appears. Interest Accrual Spreadsheet 1. As Williams could have identified in the

---

[5] The receipts provided for the mailing expenses, Other Expenses 17–18, are duplicated and the Court notes that each page represents receipts for four total mailings, which cost $25.88.

record the amount alleged to be charged in late fees, it was his obligation to present evidence to the contrary that this sum was incorrect or that there was a genuine dispute of material fact. *See Matsushita Elec. Indus. Co.*, 475 U.S. at 585–87 & n.10. Having been presented no evidence to contradict the letters or spreadsheet, I find that there is no genuine dispute of material fact and award 2023 BR $54,922.57 in late fees.

   e. *Attorneys' Fees*

Under the law of the District of Columbia, "'each litigant bears his or her own attorneys' fees,'" but "an exception to this 'American Rule' arises when the parties allocate the fees and expenses among themselves by contract." *Concord Enter., Inc. v. Binder*, 710 A.2d 219, 225 (D.C. 1998) (quoting *Urban Masonry Corp. v. N & N Contractors, Inc.*, 676 A.2d 26, 33 (D.C. 1996). If a contact provides for the awarding of attorneys' fees, "absent public policy considerations or other unusual circumstances," the Court's discretion is limited to determining what constitute a reasonable amount. *Cent. Fid. Bank v. McLellan*, 563 A.2d 358, 360 (D.C. 1989).

Here, 2023 BR argues that it is entitled to legal fees and has filed an affidavit that states it has included the fees with the principal, interest, and late fees. Rubin Aff. 1. 2023 BR amended its attorneys' fees amount to $4,995.69. Pl.'s Reply ¶ 4(c); Attorneys' Fees Stmts. Williams argues that he is unable to assess the attorneys' fees and that the figure is conclusory. Def.'s Opp'n ¶ 4.

Williams does not appear to oppose an award of attorneys' fees to 2023 BR in this matter, only the amount 2023 BR is owed. At this time, it would be within my discretion to determine the reasonableness of the claimed attorneys' fees, *Cent. Fid. Bank*, 563 A.2d at 360 n.8; however, given that there are other issues that cannot be decided on summary judgment,

doing so for attorneys' fees would be premature. *See Coryn Group II, LLC v. O.C. Seacrets, Inc.*, No. WDQ-08-2764, 2010 WL 1375301, at *6 (D. Md. Mar. 30, 2010). Therefore, this claim is denied without prejudice.

## **Conclusion**

In sum, no genuine disputes of material fact preclude me from granting summary judgment with respect to Williams's liability on default and awarding 2023 BR the principal in the amount of $1,163,969.07, mailing costs, recording fees, advertising fees, and title search fees in the total amount of $3,818.88, and late fees in the amount of $54,922.57 minus any proceeds gained in the related bankruptcy manner.

I find that genuine disputes of material fact preclude me from granting summary judgment with respect to the trustee's fees, the interest accrued, and the remaining mailing costs and recording fees. I also find a decision on attorneys' fees to be premature at this time.

A separate order shall be entered in accordance with this Memorandum Opinion.


Dated: November 2, 2017                                         /S/
                                                  Paul W. Grimm
                                                  United States District Judge

jml